**[J-42A-2024 and J-42B-2024] [MO: Mundy, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| CKHS, INC. AND THE FOUNDATION FOR DELAWARE COUNTY, | : | No. 117 MAP 2023 |
| | : | |
| | : | Appeal from the Order of the |
| Appellants | : | Commonwealth Court at No. 1118 |
| | : | CD 2022 entered on May 3, 2023, |
| | : | Reversing the Lower Court Order of |
| v. | : | the Delaware County Court of |
| | : | Common Pleas, Civil Division at No. |
| | : | CV-2022-007161, entered on |
| PROSPECT MEDICAL HOLDINGS, INC. | : | October 11, 2022 |
| AND PROSPECT CROZER, LLC, AND | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | ARGUED:  May 15, 2024 |
| | : | |
| Appellees | : | |
| | | |
| CKHS, INC. AND THE FOUNDATION FOR DELAWARE COUNTY, | : | No. 118 MAP 2023 |
| | : | |
| | : | Appeal from the Order of the |
| Appellants | : | Commonwealth Court at No. 1265 |
| | : | CD 2022, entered on May 3, 2023, |
| | : | Reversing the Order of the Delaware |
| v. | : | County Court of Common Pleas, |
| | : | Civil Division, at No. CV-2022- |
| | : | 007161, entered on October 11, |
| PROSPECT MEDICAL HOLDINGS, INC. | : | 2022 |
| AND PROSPECT CROZER, LLC, AND | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | ARGUED:  May 15, 2024 |
| | : | |
| Appellees | : | |

## DISSENTING OPINION

**JUSTICE DONOHUE**                    **DECIDED:  January 22, 2025**

This case concerns the proper standard of review when analyzing a trial court's order granting a prohibitory preliminary injunction.[1]  The Majority explains that this standard "must be highly deferential to the trial court" and limited to "whether there are []any apparently reasonable grounds[] to support the trial court's order."  Majority Op. at 17.  The Majority broadly construes the meaning of "any apparently reasonable grounds" to hold that an expert's generalized and hypothetical testimony about the effect of hospital closures on the public is sufficient to show irreparable harm for a specific hospital closure—even though the expert offered no testimony about the specific circumstances surrounding the at-issue hospital's closure and the potential effect its specific closure would have on the actual community it served.  In so doing, the Majority rejects our precedent requiring a party to demonstrate irreparable harm by presenting actual proof or concrete evidence.  Therefore, I respectfully dissent.

Prospect Medical Holdings, Inc. and Prospect Crozer, LLC ("Appellees") acquired Delaware County Memorial Hospital ("Hospital") in January 2016 from CKHS, Inc.[2]  At the time, the parties executed an asset purchase agreement ("APA") to state their shared commitment to continue to deliver healthcare—including emergency medicine and acute care services—to the community.  Appellees agreed that they would not sell or close the Hospital for at least ten years after entering into the APA unless CKHS, Inc. and the Foundation ("Appellants") consented to the sale or closure.  APA § 11.16.  On September

---

[1]  A prohibitory preliminary injunction enjoins the performance of an act that will change the status quo, while a mandatory preliminary injunction commands the performance of some positive act to preserve the status quo.  *Mazzie v. Commonwealth*, 432 A.2d 985, 988 (Pa. 1981).

[2]  CKHS, Inc., formerly known as Crozer-Keystone Health System, is a non-profit entity that had previously operated the Hospital.  First Amended Petition for Emergency Preliminary Injunctive Relief, 10/3/2022, ¶¶ 16, 27.  Appellant, the Foundation for Delaware County ("Foundation"), is a non-profit entity that serves as a charitable organization for CKHS, Inc.  *Id.* ¶¶ 17, 29.  CKHS, Inc. transferred certain funds received from the sale to the Foundation.  *Id.* ¶ 30.

21, 2022, six years after entering into the APA, Appellees announced that in sixty days they would be converting the Hospital into a behavioral health facility and would discontinue emergency and acute care services.[3]  However, Appellees did not consult with Appellants prior to announcing their transition plan.  Appellees promised that all 334 employees of the Hospital would continue to work at the Hospital during the transition period or be redeployed to vacancies at other facilities in the health system.  N.T., 10/7/2022, at 91-93.  Appellees estimated that approximately seventy-five employees would remain working at the Hospital during the transition period.  *Id*. at 104.

Appellants filed a breach of contract action, a petition for a permanent injunction to preclude the closure of the Hospital and a petition for emergency preliminary injunctive relief to preclude the closure.  On October 11, 2022, the trial court granted the preliminary injunction and ordered Appellees to "immediately suspend any actions materially altering the present operation of [the Hospital]" and "maintain all services presently offered at [the Hospital.]"  Trial Court Order, 10/11/2022, at 1-2.[4]  With respect to the requirement of

---

[3]  Appellees dispute that the discontinuation of emergency and acute care services at the Hospital constitutes a "closure" pursuant to Section 11.16 of the APA.  Appellees' Brief at 53.  I express no opinion on the merits of this question as it is not at issue on appeal.  It is only for ease of discussion that I refer to the "closure" of the Hospital.

[4]  A party seeking a preliminary injunction must establish the following six elements:

> (1) the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages;
>
> (2) greater injury would result from refusing an injunction than from granting it;
>
> (3) the injunction will restore the parties to their status as it was immediately before the alleged wrongful conduct;
>
> (4) the activity sought to be restrained is actionable, the right to relief is manifest, and the moving party must show it is likely to prevail on the merits;

(continued…)

demonstrating irreparable harm, the trial court explained that "there can be no doubt that in some instances persons presenting at this hospital with the need for acute and/or emergency services would be delayed in receiving these services if they were forced to go to another, more distant, facility." Trial Court Opinion, 12/2/2022, at 6.[5]

The Commonwealth Court reversed. The court first recognized that its task was to review the trial court's decision for an abuse of discretion and "examine[] the record 'to determine if there were any apparently reasonable grounds for the action of the court below.'" *CKHS, Inc. v. Prospect Med. Holdings, Inc.*, 1118 C.D. 2022, 1265 C.D. 2022, 2023 WL 3221623, at *5 (Pa. Commw. May 3, 2023) (non-precedential decision) (internal citations omitted). Specific to the irreparable harm inquiry, the court relied on *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.*, 828 A.2d 995 (Pa. 2003), to explain that a party must provide "actual proof of irreparable harm" or "'concrete evidence'

---

> (5) the injunction is reasonably suited to abate the offending activity; and
>
> (6) a preliminary injunction will not harm the public interest.

*Pittsburgh Logistics Sys., Inc. v. Beemac Trucking, LLC*, 249 A.3d 918, 934 n.7 (Pa. 2021). Here, the only requirement at issue is whether Appellants demonstrated irreparable harm.

[5] On October 14, 2022, Appellees filed a motion to dissolve the preliminary injunction arguing, inter alia, that there was an "imminent risk of not having sufficient staff" to care for patients at the Hospital. Motion to Dissolve Injunction, 10/14/2022, ¶ 5. At a hearing on the motion to dissolve, Appellees presented testimony that the Hospital had a steady decline in emergency and inpatient volume. N.T., 10/28/2022, at 14. Appellees also presented testimony that the radiology and cardiology departments had departed from the Hospital, in addition to several nurses, all of which impacted the Hospital's ability to treat or admit certain patients. *Id.* at 14-20. The trial court denied the motion to dissolve. However, on November 4, 2022, the Pennsylvania Department of Health ("Department") issued an order "suspending emergency department services and imposing a ban on admissions at the [Hospital] effective Monday, November 7, 2022 at 7:00 a.m." Department of Health Order, 11/4/2022, at 2. The Department cited that the Hospital was unable to provide diagnostic imaging which posed "a significant threat to the health and safety of patients." *Id.*

in support of their claims, not mere 'speculation and hypothesis.'" *CKHS, Inc.*, 2023 WL 3221623, at *8 (quoting *Summit Towne,* 828 A.2d at 1002). The Commonwealth Court found that the trial court erred because the testimony of Appellants' witness, Melissa Lyon,

> [was] markedly devoid of the concrete evidence necessary to legally justify [the trial court's] irreparable harm determination. To the contrary, all of Lyon's statements, insofar as they relate to how the local community will be affected if acute care services are no longer offered at [the] Hospital, are couched in terms that are hypothetical, generalized, and speculative, rather than ones buttressed by specific data or information.

*Id*. at *10.

In *Summit Towne*, this Court considered whether there were any reasonable grounds to support the trial court's denial of a mandatory preliminary injunction seeking the reopening and continued operation of a retail tenant's business. Summit Towne owned a shopping center in which Shoe Show of Rocky Mount, Inc. (a shoe store) was a tenant. Given a lack of commercial success, Shoe Show closed its store and vacated the premises. In response, Summit Towne sought a mandatory preliminary injunction to require Shoe Show to reopen its store and fulfill the remainder of the lease agreement. The trial court denied the request because, inter alia, Summit Towne failed to prove irreparable harm. *Summit Towne*, 828 A.2d at 999. The Superior Court reversed. We in turn reversed the Superior Court, finding that it exceeded the applicable standard of review. Concerning irreparable harm, we observed that Summit Towne's expert testified to "hypothetical" and "theoretical" scenarios where the departure of one business would supposedly harm the remaining businesses in a shopping center. *Id*. at 1002-03. We explained the trial court's conclusion that Summit Towne did not show irreparable harm was supported by the record because the testimony of its witness "rested almost entirely on speculation and hypothesis, as he provided no concrete evidence of harm such as

data relating to other stores' lost sales, decreased retention rates, or increased vacancy rates." *Id.* at 1002.

The Majority claims that *Summit Towne* did not impose a "concrete evidence" burden in preliminary injunction cases, nor did it preclude evidence in the form of "speculation and hypothesis." Majority Op. at 19. The Majority reasons that *Summit Towne*

> contained these statements in the context of instructing the intermediate appellate court to conduct a deferential review of the trial court's decision. Because the trial court in that case had denied preliminary injunctive relief, a proper application of the appellate standard of review was to determine whether the record contained "any apparently reasonable grounds" to support the trial court's action, and the *Summit Towne* Court concluded the record supported affirming the trial court because the evidence was speculative, hypothetical, and not concrete.

*Id.* at 20.

I disagree with the Majority that the substantive disposition of the injunction request by the trial court mandates a different evidentiary standard. Although the trial court in *Summit Towne* denied the preliminary injunction, this does not render the Court's discussion applicable only where a court is reviewing an order denying a preliminary injunction. The *Summit Towne* Court explained that there was support for the trial court's conclusion that there was no irreparable harm because the witness "provided no concrete evidence of harm such as data relating to other stores' lost sales, decreased retention rates, or increased vacancy rates." *Summit Towne*, 828 A.2d at 1002. Had the trial court granted the preliminary injunction, there is no logical basis to conclude that the *Summit Towne* Court would have employed a different analysis. Ascertaining whether there are

reasonable grounds for a trial court's conclusion requires a determination of whether there is concrete evidence to demonstrate irreparable harm.[6]

_____

[6] Moreover, although the *Summit Towne* Court reviewed the denial of a mandatory preliminary injunction, rather than a prohibitory preliminary injunction, this does not change the fact that concrete evidence is required to demonstrate irreparable harm for either type of preliminary injunction. In stating that a party must present concrete evidence of irreparable harm—rather than speculation—the *Summit Towne* Court expressly relied on three cases from this Court, all of which involved a prohibitory preliminary injunction. *Id*. at 1002-03 (citing *Novak v. Commonwealth*, 523 A.2d 318, 320 (Pa. 1987) (explaining that speculative considerations could not support the issuance of a preliminary injunction seeking to enjoin the Commonwealth from furloughing certain government employees*); New Castle Orthopedic Assocs. v. Burns*, 392 A.2d 1383, 1387 (Pa. 1978) (finding that an orthopedic association was not entitled to a preliminary injunction to prohibit its former employee from practicing medicine because the association did not present actual proof of irreparable harm); *Sameric Corp. of Mkt. St. v. Goss*, 295 A.2d 277, 279 (Pa. 1972) (explaining that "speculative and conjectural" proof could not support a movie theatre's request for a preliminary injunction to enjoin a nearby adult movie theatre from using a similar business name). The Majority distinguishes the facts of the foregoing cases to suggest that the holdings are of limited relevance here. *See* Majority Op. at 21-24. However, it is not the factual circumstances of these cases that matter, but rather the statements of law concerning a petitioner's evidentiary burden.

The only significance the *Summit Towne* Court recognized with respect to the mandatory nature of the preliminary injunction before it was that a court must apply greater scrutiny to a mandatory injunction because it is "an extraordinary remedy that should be utilized only in the rarest of cases." *Summit Towne*, 828 A.2d at 1001 n.7, 1005 n.13 (citing *Mazzie v. Commonwealth*, 432 A.2d 985, 988 (Pa. 1981)). While a mandatory preliminary injunction is subject to greater scrutiny, this does not change the fact that a party seeking either type of preliminary injunction must still present actual proof of irreparable harm because it is an element of the underlying claim for relief.

Even following *Summit Towne*, this Court has applied the concrete evidence test to ensure that a party seeking a prohibitory preliminary injunction presented actual proof of irreparable harm. In *Warehime v. Warehime*, 860 A.2d 41, 44 (Pa. 2004), the Court reviewed whether the Superior Court applied the correct standard of review to a trial court's denial of a prohibitory preliminary injunction. The petitioner in *Warehime* sought to enjoin a shareholder meeting from occurring, or in the alternative, enjoin a vote to adopt a new proposal at the shareholder meeting. Concerning *Summit Towne*, the *Warehime* Court explained:

> In applying the *Summit Towne* … standard to this matter, it becomes clear that the Superior Court erred in reversing the order of the trial court. The trial court below supported its denial of preliminary injunctive relief by finding, inter alia, that

(continued…)

Given *Summit Towne*'s application, it is necessary to analyze the testimony of Lyon—the only evidence relied upon by the Majority to find actual proof of irreparable harm. Lyon is the Public Health Director of Delaware County and she testified in relevant part as follows:

> [Appellants' Attorney]: If there is a closure of acute care services at [the Hospital], what would be the effect, if any, on public health?
>
> [Lyon]: In my public health experience over the last [twenty-two] years, whenever an access is removed from a community, it almost always, if not always, negatively impacts those health outcomes for the community. Accessing care, whether it's emergency or primary care, communities become very committed to a system that's near them or that they're familiar with. They build trust over years. You'll hear people say, oh, my child was delivered at that hospital and my other -- you know, my nephew's child or so on and so forth. They become very committed to those systems, and when they're removed, it becomes difficult for them to navigate and -- to different systems. They also -- if you can imagine if you're sick, its always just hard to navigate a healthcare system when you're ill in general, so areas just begin to raise themselves over time once an access point is removed from a community.
>
> \*　　\*　　\*
>
> [Appellants' Attorney]: If there were a hospital a few miles away and another hospital in Chester, would that have any

---

> [petitioner] did not satisfy prongs one and two of the preliminary injunction standard. As to prong one, the trial court stated that [petitioner] had not adduced **any** evidence of irreparable harm.

*Warehime*, 860 A.2d at 47 (emphasis in original).

Thus, when assessing whether there are any apparently reasonable grounds to support a trial court's order granting preliminary injunctive relief, it is incumbent on an appellate court to determine whether the petitioner set forth concrete evidence to establish irreparable harm.

effect from a public health perspective on the care of the immediate community.

[Lyon]: The immediate community would likely have access to those facilities, and I fully believe that there's an opportunity for those individuals in the community to access that care. However, their likelihood of doing so could be varying across the population. … I believe that there would be challenges for those populations that then could impact their access to needing immediate care and potentially can exacerbate individual health—health concerns or health afflictions or diagnoses that they may have, whether diabetes or asthma or cardiovascular.  The list can go on.  So[,] it could result in a delay of care.

[Appellants' Attorney]: If it results in a delay, would there be any possibility of greater harm to the patient?

[Lyon]: Anytime that the delay of care happens, it's always a risk of the individual to worsen and have those complications result in needing to have more emergency access -- emergency room access.  It could also lead them to be incapacitated.  It would really depend on the individual, but it almost always results in worsening care, not improved care.

*       *       *

## Cross-Examination

[Appellees' Attorney]: You've been requested to testify here today and proffered in an expert -- purported expert capacity on certain topics.  Did you conduct any studies in advance of coming today of the impacts you're talking about, the hypothetical impacts you're talking about?

[Lyon]: No, I have not conducted any studies for Delaware County.

[Appellees' Attorney]: Did you collect any data from Prospect or Mercy Fitzgerald in order to sort of play out any of the scenarios that you've been talking about to concretize them?

[Lyon]: No, I have not collected any data.

[Appellees' Attorney]: Do you have a set of written conclusions to provide the Court on any topic?

[Lyon]: I do not have any written conclusions.

\* \* \*

[Appellees' Attorney]: There are a number of other hospitals in Delaware County and the surrounding area beyond Prospect, am I right?

[Lyon]: There are other hospitals in Delaware County, correct.

[Appellees' Attorney]: And did you model out what the impact would be if Prospect is able to, upon completing its renovation, offer enhanced services for the population?

[Lyon]: So[,] I appreciate the question about modeling out. It[']s not the work that I would be doing, but no, I did not. Thank you.

[Appellees' Attorney]: Okay. Did you conduct any analysis examining the future state of [the Hospital] or what it will provide?

[Lyon]: So, again, that would not necessarily be the work that would fall into a public health department to model out, but no, I did not.

[Appellees' Attorney]: So[,] you don't have any testimony for the Court today one way or the other about the ultimate impact of the renovation by Prospect on the public health, right?

[Lyon]: That would be correct.

N.T., 10/7/2022, at 174-82.

Of importance, Lyon acknowledged that she did not collect data or perform studies with respect to the closure of the Hospital and its effect on the public it services. She also conceded that she was unable to offer any testimony about the ultimate actual impact of the Hospital's closure in the community. All that Lyon could offer was the general notion that "whenever an access is removed from a community, it almost always, if not always, negatively impacts those health outcomes for the community." *Id*. at 174. To the Majority, "Lyon's testimony provides apparently reasonable grounds to support the trial court's

conclusion that Appellees' plan to cease providing emergency and acute care services at the Hospital would result in a delay of care." Majority Op. at 17. However, this conclusion ignores the rationale of *Summit Towne* and the need for concrete evidence of irreparable harm.

Appellants demonstrate how the evidence of irreparable harm here mirrors that of *Summit Towne*. In each case, the evidence was based on general, hypothetical scenarios, as opposed to facts and data specific to the dispute. Summit Towne attempted to demonstrate irreparable harm by providing testimony to suggest that the departure of one business would harm the remaining businesses in a shopping center. In rejecting this effort, we explained that the testimony of Summit Towne's witness "rested almost entirely on speculation and hypothesis, as he provided no concrete evidence of harm such as data relating to other stores' lost sales, decreased retention rates, or increased vacancy rates." *Summit Towne*, 828 A.2d at 1002. The same is true here as Lyon failed to provide any specific data, let alone any conclusion about what effect the Hospital's future closure would have on the actual community it served. Lyon's testimony simply is not sufficient to establish irreparable harm.

The Majority also claims that the Commonwealth Court erred by "reweighing the testimony instead of determining whether the trial court had any reasonable grounds to issue the injunction." Majority Op. at 20. Again, I disagree. Assessing Lyon's testimony to ensure that it was legally sufficient to demonstrate irreparable harm is not "reweighing" her testimony; rather, the Commonwealth Court's assessment of Lyon's testimony was necessary to ensure that there were reasonable grounds for the trial court to issue the preliminary injunction.

Under the Majority's rationale, any time a hospital closes, irreparable harm automatically results so long as an expert can testify that this is generally the case—

regardless of whether the expert provides any evidence related to the specific hospital. This overly broad framework would dispense with any meaningful standard of review of preliminary injunctions. If the Majority is of the view that prevention of hospital closures is an exception to the irreparable harm evidentiary requirement for the issuance of a preliminary injunction, then it should clearly articulate this rule. However, and to be clear, Appellants offered no concrete evidence to support irreparable harm in this case. Absent concrete evidence, I must conclude that there were no apparently reasonable grounds to support the trial court's finding that irreparable harm would result from the Hospital's closure.

The Majority also addresses a provision of the APA purporting to stipulate that irreparable harm would occur if the agreement were breached. Specifically, the APA provides:

> The Parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached. It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions (without the need to post bond or other security) to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity.

APA § 14.21.

Although the Majority recognizes "that a contractual provision alone cannot compel a court to issue injunctive relief[,]" it nonetheless concludes that the provision "buttresses the trial court's finding of irreparable harm." Majority Op. at 18. In my view, the contractual provision is entirely irrelevant to our analysis. Parties cannot stipulate to the existence of irreparable harm if a specific event occurs because injunctive relief is an equitable remedy that only courts have the authority to order based upon fact specific evidence and the balancing of interests. *See First Health Grp. Corp. v. Nat'l Prescription*

*Adm'rs, Inc.*, 155 F. Supp. 2d 194, 235 (M.D. Pa. 2001) ("It would represent an extraordinary variance from this basic principle for a court to recognize that the parties to a suit at equity have contracted around one of the[] fundamental elements [of a preliminary injunction].").[7]

The Majority seemingly agrees with this principle, *see* Majority Op. at 18, yet adopts a middle-ground approach to suggest that "it is not an abuse of the trial court's discretion to consider the parties' contractual agreement as evidence of how they understood the significance of potential anticipated breaches at the time they made their agreement and weigh their agreement in favor of finding irreparable harm." *Id*. at 19. The fallacy of this conclusion is directly related to the lack of an evidentiary record to support the preliminary injunction. The APA was entered into six years prior to the closure of the Hospital and the stipulation to irreparable harm was based on conditions existing at that time. The record is devoid of evidence of those historical conditions which may have supported a conclusion that irreparable harm would result from a closure. But that was

---

[7] As the Commonwealth Court recognized, *The York Group, Inc. v. Yorktowne Caskets, Inc.*, 924 A.2d 1234 (Pa. Super. 2007), is the only state court case in this Commonwealth to address the issue of whether parties may stipulate to irreparable harm via contract. The parties in *Yorktowne Caskets* agreed in their distributor agreement that breaches of the confidentiality and exclusivity provisions would constitute irreparable harm. Beyond acknowledging this agreement, the court did not analyze its significance or provide any discussion of whether the agreement by itself could support a finding of irreparable harm. Instead, the court concluded that testimony presented at the preliminary injunction hearing supported the finding of irreparable harm. *Yorktowne Caskets*, 924 A.2d at 1243. After reaching this determination, the court analyzed whether a liquidated damages clause in the agreement would preclude a finding of irreparable harm because the liquidated damages clause represented an adequate remedy at law. The court rejected this contention because "the parties agreed in their contract that equitable relief was available despite the existence of the liquidated damages clause and that [a] violation of the exclusivity provision, which had been breached in this case, would constitute irreparable harm." *Id*. at 1244. Although the court relied on the parties' irreparable harm stipulation to supersede the parties' liquidated damages clause, it did not rely on the stipulation for the distinct issue of analyzing whether irreparable harm existed. Therefore, the case is of limited relevance here.

then.  Are the conditions different now?  Maybe if utilization was the same at these two points in time, an argument could be made that based on agreed upon conditions, irreparable harm would result from the closure of the Hospital.  But given a record devoid of any evidence related to this case, reliance on the stipulation of irreparable harm (based on unstated conditions) is as irrelevant to a finding of irreparable harm at this point in time as reliance on a generalized hypothetical opinion that irreparable harm would ensue from the closure.

Neither the record evidence nor the APA support the grant of the prohibitory preliminary injunction in this case.  Therefore, I respectfully dissent.